R. Turney **WILLIAMS**, Plaintiff,

v.

**REVLON COMPANY**, Defendant.

Ronald T. **WILLIAMS**, Plaintiff,

v.

**PHILIPS, N.V.**, Defendant.

Ronald T. **WILLIAMS**, Plaintiff,

v.

The **DANNON COMPANY**, Defendant.

Ronald T. **WILLIAMS**, Plaintiff,

v.

**UNILEVER UNITED STATES, INC.**, Defendant.

Ronald T. **WILLIAMS**, Plaintiff,

v.

**BRISTOL–MYERS SQUIBB**, Defendant.

Nos. 93 Civ. 4837 (JSM), 93 Civ. 5460 (JSM), 93 Civ. 8161 (JSM), 93 Civ. 8160 (JSM) and 93 Civ. 8159 (JSM).

United States District Court, S.D. New York.

March 28, 1994.

Ronald T. Williams, pro se.

Gila L. Schwartz, Counsel, Revlon Co., New York City, for Revlon Co.

Edwin R. Matthews, Cuyler Burk & Matthews, New York City.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City.

## *MEMORANDUM AND ORDER*

MARTIN, District Judge.

In his comic strip "Li'l Abner", Al Capp created a character, Joe Btfsplk, who was so prone to misfortune that he permanently had a little black cloud hovering over his head. Anyone who has read the various complaints filed by plaintiff in these actions would conclude that, compared to him, Joe Btfsplk was a person of extreme good fortune. If plaintiff were to be believed—and he is not—every consumer product to which he has been exposed has caused him serious bodily injury. As is detailed below, plaintiff has filed a series of product liability claims, apparently believing that because he is serving multiple life sentences for murder convictions, the Court lacks the power to deter his conduct. The Court cannot tolerate this type of cynical abuse of the judicial process and will use its full power to put an end to plaintiff's use of the courts as part of a fraudulent scheme.

Plaintiff, who is serving sentences of life imprisonment in a state prison in West Virginia, filed all of the above-captioned product liability cases in this Court between July 16, 1993 and November 29, 1993. Three of the cases, against the Dannon Company, Unilever and Bristol–Myers Squibb Company, were all filed on the same day.

The case against Revlon, which was received in this Court on May 28, 1993, and accepted for filing on July 16, 1993, alleges

that on August 14, 1992, plaintiff sustained severe chemical-like burns from a plastic container of Revlon Silver Flex Protein Conditioner that he purchased on or about August 3, 1992. As a result, plaintiff allegedly was "permanently and severely shocked and injured; ... sustained an infection of the blood stream; ... sustained a dermatitis of the skin; a skin infection and disease and disfigurement of the body and general loss of health, all of which is permanently disabling to him." Plaintiff claimed that these injuries caused "extreme physical pain and mental anguish" and that he is "unable to engage in any gainful activity at the present time, and his earning capacity has been greatly and forever permanently diminished and impaired."

In the *Dannon* case, received in this Court on October 25, 1993, Williams alleges that on or about March 3, 1993, he ate some Dannon yogurt that contained glass, and caused him "bleeding from the mouth, puncture-cuts to the lower lips and gums, resulting in the severing of a nerve, and paralyzing the plaintiff's lip and adversely affecting his personal appearance and speech. As a result of said injuries the plaintiff may, in the future, expend and become liable [for] considerable sums of money for medical and nursing care, hospital services and medicines; as a result of said injuries the plaintiff has been and will be prevented from attending to his usual occupation."

In his case against Philips NV, filed on August 4, 1993, plaintiff alleges that on March 9, 1993, he suffered personal injuries and property damage from a fire ignited by a defective Magnavox television, which he received as a gift on or about May 18, 1990. He claims that the fire destroyed not only the television itself, but also paintings worth $850, clothing worth $600 and caused him $70,000 in damages due to smoke inhalation.

In the *Unilever* case, received in this Court on October 29, 1993, Williams alleges that he was injured on January 21, 1993, when a can of Rise shaving lather foam exploded while he was shaving. He claims that he suffered "severe and irreparable injury to his head with facial cuts, lacerations, contusions and bruises." As a result, plaintiff claims he "suffered and continues to suffer acute and agonizing pain, both mental and physical."

In his Complaint against Bristol–Myers Squibb, received in this Court on November 8, 1993, plaintiff alleges that on or about June 20, 1992, he became "sick, with kidney damage, painful urination, bloody urine, reduced urine formation, fever and coma after ingesting Nuprin." As a result, plaintiff claims that he "has incurred legal and medical expenses, loss of health and was further damaged by the destruction of power to labor and earn money."

Nowhere in any of his Complaints or in his motions to proceed in forma pauperis does plaintiff mention that he is incarcerated in a West Virginia prison, is serving two sentences of life imprisonment, plus a sentence of imprisonment for 200 years, and has been sentenced to the death penalty in the State of Arizona. Each of these actions contains a demand for hundreds of thousands of dollars in damages.

On November 4, 1993, this Court ordered, on the record, that plaintiff supply the Court by December 6, 1993, with a list of every lawsuit that he has brought within the past three years, and enjoined plaintiff from filing any other lawsuit alleging a claim of product liability in any jurisdiction without obtaining approval from this Court. Finally, the Court stayed all of the cases listed above pending receipt of the required list. This order was mailed to plaintiff on November 9, 1993, along with a copy of a letter dated November 9, 1993, to the United States Attorney for the Southern District of New York, in which the Court informed the United States Attorney of the plaintiff's pattern of filing apparently fraudulent lawsuits in the Southern District of New York. Subsequently, on November 22, 1993, the Court reissued its order of November 4, 1993, and further directed plaintiff to file with the Court by December 15, 1993, any affidavit and memorandum of law that he might wish to submit on the question of whether or not the Court should impose Rule 11 sanctions for his bringing fraudulent actions, "which sanctions may include the forfeiture of all products he has received as a result of any action alleging

product liability and the forfeiture of any computer or typewriter that he has used to prepare these fraudulent lawsuits." This order was personally served upon plaintiff on November 30, 1993.

On November 19, 1993, plaintiff moved to dismiss his cases against Revlon and Philips, citing his "inability to secure legal assistance and his incapacity to prosecute this civil matter." In addition, on the same date, Williams sent a letter to the Court, stating that he had moved to withdraw all of his cases "due to several factors, including lack of professional assistance, geographic location, time, financial and unlikelihood of success." No such motions have been received, however, in the cases against Dannon, Unilever and Bristol Myers. Moreover, in his letter, plaintiff stated that he intended to continue to pursue cases against Reebok LTD and Chase Mart. These cases apparently have not been filed in this Court as of this time, and plaintiff has provided the Court with no further information regarding these actions.

On December 17, 1993, the plaintiff filed a Response to the Court's orders, and stated again that he wished to dismiss the four cases captioned in the Court's Memorandum and Order dated November 22, 1993. In his response, plaintiff failed to set out the list of cases that he had been twice ordered to provide. He stated that his claims were genuine and based in fact. He further presented the Court with a list of purported witnesses to verify his alleged injuries and asked for an evidentiary hearing with respect to the imposition of sanctions under Rule 11, discovery, appointment of counsel and the issuance of subpoenas for his witnesses.

Next, on December 20, 1993, this Court entered another Order stating that plaintiff's response to its previous Order had been inadequate, but that before taking any action with respect to sanctions, the Court would provide plaintiff with another opportunity to submit a list of all lawsuits that he had initiated in the past three years, and to state, with respect to every lawsuit in which plaintiff alleged personal injury or property damage, the approximate date on which he purchased the product that caused the injury, the exact location of the purchase, the precise injury suffered and any medical attention received as a result of that injury. In addition, plaintiff was ordered to identify each witness who could present testimony with respect to each lawsuit and provide a brief summary of each witness' testimony. This information was to be provided to the Court no later than January 31, 1994. In addition, the Warden of the West Virginia penitentiary in which plaintiff is incarcerated was ordered to provide the Court with an affidavit setting forth the date that plaintiff was first incarcerated in that institution and whether or not he was released at any time. The Warden was also directed to provide the Court with a complete copy of plaintiff's medical records during his incarceration.

In response to this Order, on February 9, 1994, plaintiff filed a Response that is identical, through Point 7, to his first Response. Plaintiff again failed to list all product liability cases that he has filed in the past three years, and failed to provide the details of his product liability claims that were specifically requested by this Court. He again stated that he wished to dismiss the cases against Dannon, Revlon, Unilever and Philips. He restated that the actions were genuine, and that at the time that he filed them he did not realize that he would not be able to produce competent evidence to support his claims, and again requested that counsel be appointed to assist him. In support of his statement that he had no time to prepare his claims, he stated that he had begun to work for the prison Food Service Department on September 15, 1993, and since then, had worked 134 consecutive days. For this work, he received base pay of $26.00 per month, and overtime pay of $.23 per hour, totalling $68.08 in approximately five months.

On March 14, 1994, the Court received the affidavit of George Trent, Warden of the West Virginia Penitentiary in Moundsville, West Virginia, and a copy of plaintiff's medical records from that institution. The affidavit states that plaintiff began serving his first sentence of life imprisonment on February 6, 1976; that he was outside the prison for various periods due to hospital stays, escapes and imprisonment in Arizona during the period between 1976 and May 6, 1984; and that

he has not been outside the prison since May 6, 1984. Therefore, plaintiff clearly was imprisoned at all times referred to in the various complaints that he has filed in this Court.

A review of plaintiff's medical records during the time periods referred to in his complaints provides absolutely no confirmation of any of the allegations of injury contained in those complaints. There are no indications that plaintiff sought or received treatment on the dates stated for any of the allegedly severe injuries listed in his complaints. Instead, entries on March 8, 1993 and March 24–26, 1993, indicate normal kidneys and urinary tract and a normal urine culture. There also is no indication that plaintiff received Nuprin on or about June 20, 1992. The medical records do contain, however, a memo from plaintiff to Dr. Munoz at the prison infirmary, dated June 7, 1992, in which he states that he had experienced skin rash, dizziness, mouth sores, vomiting, diarrhea, blurred vision, confusion and kidney damage after taking Indocin. These are some of the same symptoms that plaintiff sought to attribute to his alleged taking of Nuprin in June 1992. In this memo, Williams stated that he had initiated a lawsuit against Merck & Co. as a result of these injuries. While the prison records do indicate that plaintiff received Indocin between July 8, 1992 and September 8, 1992, they contain no evidence of any such problems or relevant medical treatment during that time period (although plaintiff did have a cholesterol test on July 10, 1992).

In addition, there is indication that plaintiff wrote a letter to Schering–Plough Corp. complaining of severe abdominal pain, vomiting, delirium, seizures and coma after taking Theo–Dur on approximately May 29, 1993. Although there is an entry showing that Theo–Dur was prescribed for plaintiff on May 19, 1993, the prison doctor responded to Schering–Plough's inquiry about this complaint with the statement that he had no record of adverse reactions to Theo–Dur on or around May 29, 1993.

In addition to the complete lack of support for plaintiff's allegations of injuries to be found in his medical records, the record is now perfectly clear that plaintiff's allegations

of monetary damages are totally spurious. As a prisoner, whose medical care is provided by the State, he has no medical expenses. Since Williams is serving two sentences of life imprisonment and one sentence of 200 years in West Virginia, and is under sentence of death in the State of Arizona, it is safe to say that there is no possibility that he will at some point be released and become responsible for paying his own medical expenses.

For the same reason, it is clear that the allegations that his future earning capacity (which did not, and does not exist, except to the minimal extent set forth above) has been reduced by his alleged injuries is totally contrived. Moreover, Williams himself has submitted documentation that shows that he is now working in the prison food service, despite his allegation in the *Dannon* case that he has been permanently disabled from performing any labor of any sort.

Thus, all of the facts and circumstances, including plaintiff's failure to provide the information requested by the Court, compel the conclusion that plaintiff's complaints are fraudulent, and are part of a pattern intended to defraud and harass the named defendants and various other companies, including Merck & Co., Schering–Plough Corp., Chase Mart, Reebok Ltd, and perhaps others of which the Court presently is unaware. These complaints were filed in violation of Rule 11, which requires a litigant to certify that "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry [a pleading] is well grounded in fact ... and is not interposed for any improper purpose ..."

The purpose of Rule 11 is to impose disciplinary sanctions to check abuses in the signing of pleadings. *See* Rule 11, Advisory Committee Note, 1983 Amendment (West 1992). Such abuses include the use of the judicial process to harass and gain improper leverage against defendants, and the waste of judicial resources and resulting inefficiencies and delays that affect all actual and potential litigants in the federal courts. *In re Martin–Trigona,* 737 F.2d 1254, 1261–62 (2d Cir. 1984); *Weil v. Markowitz,* 829 F.2d 166, 171 (D.C.Cir.1987); *Dreis & Krump Mfg. v. International Association of Machinists,* 802

F.2d 247, 255 (7th Cir.1986) ("Mounting federal caseloads and growing public dissatisfaction with the costs and delays of litigation have made it imperative that the federal courts impose sanctions on persons and firms that abuse their right of access to these courts."); *Procup v. Strickland,* 792 F.2d 1069, 1074 (11th Cir.1986) ("The court has a responsibility to prevent single litigants from unnecessarily encroaching on the judicial machinery needed by others.").

■ Rule 11 sanctions must be tailored, in the discretion of the court, to the particular facts of the particular case. *Weil v. Markowitz,* 829 F.2d at 171; *Cotner v. Hopkins,* 795 F.2d 900, 902 (10th Cir.1986). Moreover, as the Court stated in *Wiideman v. McKay,* 132 F.R.D. 62, 66 (D.Nev.1990), "fashioning an appropriate sanction against an indigent, pro se litigant, is not an easy task. Such individuals do not feel the same threat of being placed in jail as do persons who are not already incarcerated, and typically have no money and so monetary sanctions are usually ineffective. Consequently, such individuals are largely immune from the normal types of sanctions usually imposed against recalcitrant litigants."

■ In authorizing, and indeed, requiring an "appropriate sanction", Rule 11 does not in any way limit the court's choices. *Lieb v. Topstone Industries, Inc.,* 788 F.2d 151, 157–58 (3rd Cir.1986); *Matthews v. Freedman,* 128 F.R.D. 194, 202 (E.D.Pa.1989), *aff'd,* 919 F.2d 135 (3rd Cir.1990). Deterrence is frequently stated to be the chief goal of Rule 11, *see, e.g., Keener v. Dept. of the Army,* 136 F.R.D. 140, 150 (M.D.Tenn.1991), *aff'd,* 1992 WL 34580, 1992 U.S.App. LEXIS 2822 (6th Cir. 2/24/92), but it also has been said that "[t]he compensatory, punitive, and deterrent aspects of sanctions may have varying claims to priority, depending on the nature of the case and the violation." *Lieb v. Topstone,* 788 F.2d at 158.

■ This plaintiff has displayed a pattern of conduct that indicates a blatant disregard for the truth and for the proper function of the courts. This conduct must be stopped completely and prevented from recurring in the future. Plaintiff's failure to provide the Court with the specific information requested about these cases, and with a complete list of all cases that plaintiff has filed in the past three years, leads the Court to believe that plaintiff intends to continue with his pattern of fraudulent litigation, and to continue any similar cases that he may have pending in other courts. As the Court stated in the *Wiideman* case, this plaintiff is unlikely to be deterred by the simple imposition of a monetary sanction, which he may well be unable to pay, or by the threat of a finding of contempt of court. Therefore, the Court must find additional methods to make its message clear to plaintiff.

Accordingly, it is hereby ordered that plaintiff forfeit to the United States any computer, monitor, printer, typewriter or word processor and any accessories to such instruments that he presently has in his possession. This sanction is reasonable and appropriate in that those instruments have been or may be used in the production of the complaints and other pleadings, papers and correspondence in plaintiff's fraudulent cases and have made it possible for plaintiff to maximize his attempts at fraud and harassment with minimal effort.

In addition, it is ordered that plaintiff is permanently enjoined from filing any new product liability case or proceeding in any federal district court without first seeking leave of this Court by means of a "Motion Pursuant to Court Order Requiring Leave to File", supported by a sworn affidavit that sets out the following information: the name of the proposed defendant, the name of the product complained of, the date of use of the product, how plaintiff came into possession of the product, the nature of all purported injuries, and the nature of proof of such injuries that plaintiff can reasonably expect to offer in support of his claims, including names of anticipated witnesses and a summary of the expected testimony of each. No complaint may be filed in any federal district court until such leave has been granted by this Court.

Furthermore, plaintiff is permanently enjoined from filing any new product liability or personal injury case or proceeding in any state or federal court without including in his first filing with that court, whether it be a

complaint or other pleading, the following statement:

"This plaintiff has been enjoined from filing fraudulent product liability claims by order of the United States District Court for the Southern District of New York. *See Williams v. Revlon,* 93 Civ. 4837 (JSM) (1994)."

In addition, plaintiff is ordered to inform the courts and the attorneys for defendants in the Merck, Reebok, Chase Mart and any other cases that he currently has pending of the issuance of this Order and to provide them with a copy of the same.

In addition, plaintiff is directed to state on the outside of *any* envelope mailed from the prison by plaintiff, "This prisoner has been enjoined from asserting fraudulent personal injury claims." The Warden of any penitentiary in which plaintiff is confined is directed to refuse to mail *any* envelope which does not comply with this direction.

Finally, plaintiff is ordered to pay a monetary sanction in the amount of $5,000 to the Clerk of the Court.

The United States Attorney for the Southern District of New York is directed to take all steps necessary to ensure enforcement of this Order including the attachment of any funds in plaintiff's commissary account and any monies received as a result of work performed in prison.

The five cases captioned above are dismissed.

SO ORDERED.